[Civ. No. 11030. First Appellate District, Division Two.—June 19, 1939.]

W. L. BROWN, Appellant, v. HAROLD J. BOYD, as City and County Controller, etc., et al., Respondents.

Grover O'Connor for Appellant.

John J. O'Toole, City Attorney, Thomas P. Slevin, Deputy City Attorney, Frank L. Fenton, Louis V. Crowley and Cooley, Crowley & Supple for Respondents.

NOURSE, P. J.—Plaintiff sued as a taxpayer, under section 526a of the Code of Civil Procedure, to restrain the municipal officers of the city and county of San Francisco from paying the salary attached to the office of captain of police to one alleged to have been illegally promoted from a lieutenancy. The defendants had judgment. The plaintiff's appeal raises a great many points which we will leave undecided as the grounds herein covered are sufficient for the purposes of the decision. These are the invalidity of the ordinances creating the position, and the right of the plaintiff to sue.

On December 11, 1933, the civil service list of eligibles for appointment to the position of captain in the police department expired by lapse of the four-year period established in section 145 of the city charter. Thereafter no valid appointment to the position of captain could be made from such list. (*Mann* v. *Tracy,* 185 Cal. 272, 273 [196 Pac. 484]; *Jensen* v. *Civil Service Com.,* 4 Cal. (2d) 334, 336 [49 Pac. (2d) 283].) On December 11, 1933, two purported emergency ordinances were introduced, adopted, and approved by the board of supervisors and the acting mayor, respectively, one creating three additional positions as captain of police by amending the "annual salary ordinance", the other appropriating $7,000 out of the special fund for payment of the salaries of three additional police captains, which positions were also "created" by this ordinance, at a monthly compensation therein fixed at $300 each. Both ordinances declared the existence of an emergency in that the "uninterrupted operation of the police department requires the creation of such positions . . . and because of the imminent expiration of the civil service list of eligibles for captains". The purpose of thus declaring an emergency was to avoid the provisions of section 13 of the charter that an ordinance other than an emergency measure shall be passed only after two

readings and separate votes thereon held at least ten days apart. On the same day that these ordinances were passed the police commission appointed and promoted to the three new positions the three lieutenants in the department who ranked highest on the expiring civil service list. Thereupon the three were installed as captains and salary warrants calling for the payment of $300 were issued monthly to each, but, pursuant to an oral agreement made before these proceedings were initiated, all three returned to the city treasurer monthly the difference between the salary fixed to be paid to a lieutenant and the salary of a captain, this arrangement to hold until vacancies regularly occurred in the position of captain to which these individuals could be ''regularly'' appointed. It is the position of the appellant that the entire plan outlined in these proceedings was conceived and executed for the sole purpose of giving preference to these three lieutenants over those who might thereafter become eligible for promotion to captaincies as a result of a new civil service examination, and that the official declaration of an emergency was a mere pretense to effect this unlawful purpose. The city replies that its declaration cannot be questioned in this proceeding, that the plan as carried out relieved the city of the expense and delay of conducting a new examination, and that, by reason of the refund of the extra salaries, the taxpayer has not been injured. All these considerations fall before the single question of ''power''. If the constitutional limitations (reserving to the electors of the city the power of referendum over these ordinances) deny to the supervisors the power to make the enactments as urgency measures, the economic questions of expediency, like the questions of good faith and motives, are beyond judicial concern.

Section 1 of article IV of the Constitution provides generally for the reservation in the people of the right of the initiative and referendum. The section is long and comprehensive, and we refer to such portions only as seem to be pertinent. After defining the power so reserved and providing procedure for its operation in reference to matters of state-wide concern, the section declares: ''The initiative and referendum powers of the people are hereby further reserved to the electors of each county, city and county, city and town of the state to be exercised under such procedure as may be provided

by law. . . . Nothing contained in this section shall be construed as affecting or limiting the present or future powers of cities or cities and counties having charters adopted under the provision of section eight of article XI of this Constitution." The section is made self-executing, and it is expressly provided that no legislation may be enacted limiting or obstructing "the powers herein reserved". We should pause here to note that the powers so reserved are powers resting in the people and the electors and not powers resting in the legislature or in the corporate agencies of the state. The powers resting in cities and cities and counties exercised under their respective charters, and expressly saved by the section, are the powers conferred by other sections of the Constitution and which are in nowise inconsistent with these powers reserved to the people.

In defining the operation of the power of referendum the section declares that certain urgency measures may be excepted from its restrictions, but in this connection it is expressly declared that "no measure creating or abolishing any office or changing the salary, term or duties of any officer, . . . shall be construed to be an urgency measure".

Section 8 of article XI of the Constitution permits a city, or a city and county, to frame a charter for its own government "consistent with and subject to this Constitution". Section 6 of the same article authorizes cities and cities and counties operating under charters so adopted "to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters". Section 11 of the same article gives to such bodies the power to enact local police, sanitary, and similar regulations.

Conformably with these constitutional provisions the city and county of San Francisco adopted a new charter effective January 8, 1932. (Stats. 1931, p. 2973.) Section 179 of this charter preserved the right of the electors to initiate legislation, gave the supervisors the power to refer an ordinance to the electorate, but did not provide for the exercise of the constitutional power reserved to the electors by way of a referendum (except as to ordinances granting franchises). Section 13 of this charter required that an ordinance should not be passed until "after two readings and votes at separate meetings of the board, which meetings shall be at least ten days apart. . . . Annual budget and appropriation ordi-

nances shall be passed only after two readings, not less than five days apart.'' The same section makes an exception to the first restriction mentioned in case of emergencies as defined in section 16. This section declares that no ordinance affecting franchises, grants, or bond issues shall be passed as an emergency measure and specifies as emergencies certain police regulations and ''provision for the uninterrupted operation of any city and county department or office, or action required to comply with time limitations as established by law''.

We should pause here to note that, though the charter did not recognize the full reserved power in the electors declared by section 1 of article IV of the Constitution, it does specify a procedure in sections 13 and 16 for the enactment or ordinances which is somewhat similar to the provisions of the Constitution, and that, though it does define certain circumstances which may be deemed as emergencies, it does not differ from the constitutional declaration that ''no measure creating or abolishing any office or changing the salary, term or duties of any officer . . . shall be construed to be an urgency measure''. On this phase of the case it would seem to follow necessarily that, where the state reserved to the electors of the municipality the power to exercise the referendum on measures creating public offices and relating to the salary, term or duties of officers, and, when the municipality in its charter made no provision for the exercise of that power inconsistent with the declaration in the Constitution, that irrespective of the provisions of article XI of the Constitution specifying what the city might regulate by charter, the failure of the city to so act leaves the provision of article IV fully operative.

But we need not rest our decision upon this somewhat narrow ground that, from the failure of the city to act under article XI, it must be denied the power to legislate free from the constitutional restriction. We prefer to rest it upon the ground that the Constitution has reserved this power to the electors of the city and that all charters adopted under article XI must be ''consistent with and subject to this Constitution''. For this view we have ample authority from the courts of this state, and for that reason we disregard without comment the authorities cited from other jurisdictions.

In *Hopping* v. *City of Richmond*, 170 Cal. 605, 609. 610 [150 Pac. 977], our Supreme Court, having this same ques-

tion before it, said: "The people of the city of Richmond derive the power of referendum from its charter adopted and approved by the legislature in 1909, and from the amendment of section 1 of article IV of the state Constitution, adopted October 10, 1911." And again, "So far as the final clause of section 1, of article IV, reserves the powers of initiative and referendum to the people of cities, it refers back to the opening clause for a description of the powers so reserved, and the power of the people of the cities must, therefore, be deemed to be the same in character as that described in the opening clause with reference to the people of the state, that is to say, it applies only to the acts of the city council, or other legislative body of the particular city, which are exercises of its legislative power." And again, "The declaration of the Constitution that its provisions do not affect or limit the referendum power reserved to the people of any city by its charter, does not limit the constitutional reservation nor enlarge those reserved by such charter. The two reservations are thereby made independent of each other. The constitutional reservation goes to the full extent expressed by its language. If the charter differs from the Constitution in any respect it does not thereby diminish the power reserved by the Constitution. On the other hand, if the powers reserved by the charter exceed those reserved in the Constitution the effect of the charter would be to give to the people the additional powers there described. (*Long* v. *Portland,* 53 Or. 92 [98 Pac. 149, 1111].)"

In full accord is *Hill* v. *Board of Supervisors,* 176 Cal. 84, 86 [167 Pac. 514], where the court said: "And finally it is self-evident that the legislature itself could not abridge nor even hamper the exercise of those powers by any of the subordinate mandatories of the state—first, because the reservation being in the Constitution is not subject to such legislative abridgment, and second, because the Constitution in terms declares that the legislature shall have no authority to limit or restrict the powers reserved." To the same effect are *Garver* v. *Williams,* 96 Cal. App. 118, 120 [273 Pac. 604]; *People* v. *Elkus,* 59 Cal. App. 396, 404 [211 Pac. 34]; *Shay* v. *Roth,* 64 Cal. App. 314, 323 [221 Pac. 967]; *Harder* v. *Denton,* 9 Cal. App. (2d) 607, 608 [51 Pac. (2d) 199].

Another line of decisions, some of which are cited in *Voorhees* v. *Morse*, 1 Cal. (2d) 179, 189 [34 Pac. (2d) 153], holds that, when a city avails itself of the privilege of making itself independent of general laws in respect to its municipal affairs in a charter adopted under sections 6 and 8 of article XI of the Constitution, it is nevertheless subject to other limitations provided in the Constitution. All the cases cited by respondents holding generally that when a city proceeds under article XI, its charter becomes "all embracing and unrestricted as to its municipal affairs" have reference to the supremacy of the charter over general laws in respect to municipal affairs and do not controvert the rule that such charters are subject to the limitations of the Constitution.

From the foregoing it follows that when the city and county of San Francisco adopted its present charter "consistent with and subject to" the Constitution, the constitutional reservation of the power of referendum was read into and became a part of the charter with the same effect as though it had been expressly incorporated in the charter. By the same reasoning, when the Constitution declared that "no measure creating or abolishing any office or changing the salary, term or duties of any officer" should be construed as an urgency measure, it in express terms defined in part what that reserved power of referendum should be. Thus, though the city charter could extend the limitations upon the powers of the supervisors and thereby add to the reserved powers in the electors, it could not, by definition, or otherwise, limit that reserved power. This being so it follows that the ordinances under attack are invalid if they create an office or change the salary, term, or duties of an officer.

That a police captain is a public officer goes without question. This has been decided long before the adoption of section 1 of article IV. (*Farrell* v. *Board of Trustees*, 85 Cal. 408, 416 [24 Pac. 868]; *Logan* v. *Shields*, 190 Cal. 661, 665 [214 Pac. 45]; *Maggi* v. *Pompa*, 105 Cal. App. 496, 501 [287 Pac. 982]; *Black* v. *Board of Police Commrs.*, 17 Cal. App. 310, 313 [119 Pac. 674]; *Noble* v. *City of Palo Alto*, 89 Cal. App. 47, 52 [264 Pac. 529]; Pen. Code, sec. 817; 21 Cal. Jur., p. 389.) In the case of *Farrell* v. *Board of Trustees*, *supra*, it was held that the creation of a police captaincy

was a legislative act. By the provisions of section 143 of the San Francisco charter the only method for the creation of new positions in any department is by "appropriation ordinance of the board of supervisors". It was by such method that the supervisors purported to create these three new captaincies. We will not quibble over the use of the word position instead of office, because here there is no distinction. The word position was used in the section to embrace both officers and employees. Section 35 of the charter, which relates to the police department only, uses the three expressions—position, officer, and employee. It designated the "private" a "police officer". If a captain is not an officer the word has been incorrectly used since the adoption of the codes in 1872, and we cannot conceive what member of the police force is referred to in section 35 as an officer if not a captain of police. The first ordinance purported to create three additional offices in the police department. It was such an ordinance as could not be declared an urgency measure under the constitutional limitation. It was void in its inception, and the second ordinance, purporting to appropriate funds to pay salaries attached to such offices, would fall with the first.

The respondents make a veiled attack upon the status of appellant's appearance herein as a taxpayer of the city and county. The allegation of the complaint to that effect was denied for lack of information and was found by the trial court to be true. His capacity to sue as such is expressly stated in section 526a of the Code of Civil Procedure. Having shown that the ordinances purporting to create the new positions were void, and that the appointment of the three lieutenants to those positions was for that reason invalid, the taxpayer has made a case coming squarely within the code section because payment of compensation to these individuals under such circumstances would be an "illegal expenditure" of the public funds of the city. This conclusion rests upon the ancient doctrine announced in *Zottman* v. *City of San Francisco*, 20 Cal. 96, 102 [81 Am. Dec. 96], that "the mode in such cases constitutes the measure of the power". If the city was without power to create the positions in the manner followed, the payment of compensation to the occupants is beyond the power of the city au-

thorities, and hence subject to restraint under the code section.

The judgment is reversed.

Sturtevant, J., and Spence, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 19, 1939, and an application by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 17, 1939.